

1
2
3
4

Douglas E. Miller
P.O Box 12494
Prescott, AZ 86304
623-680-1766
konaranchllc@gmail.com
Pro se

5
6
7
8
9

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

10
11
12
13
14
15
16
17

DOUGLAS E. MILLER

            Plaintiff (pro se)

    v.

UNITED STATES DEPARTMENT
OF THE INTERIOR, et al.,

          Defendants

CV-14-08240-NVW

**2nd AMENDED COMPLAINT**

**Assigned to: Honorable Neil V. Wake**

18
19
20
21
22

Pursuant to this Court's Order of April 6th 2016 (DOC 55) in which Plaintiff was given leave by the Court to file a 2nd Amended Complaint, and in accordance with Fed. R. Civ. P. 15(a)(2) and LRCiv 7.1, pro se Plaintiff Douglas E. Miller hereby presents his 2nd Amended Complaint and alleges as follows:

23
24
25
26
27
28

(Notice To The Court re Exhibits: As regards the attachment of exhibits to an Amended Pleading, pro se Plaintiff Miller was challenged to interpret the apparent contradictory statements regarding attaching exhibits to an Amended Pleading as given in LRCiv 7.1(d)(2) (allowing incorporation by reference) and LRCiv 15.1(b)

1

(disallowing incorporation of any exhibit attached to the original pleading). Further, LRCiv 15.1 only addressed (a) Amendment by Motion and (b) Amendment as a Matter of Course or Consent. Plaintiff could find no respective rule regarding Amendment by Court Leave. Plaintiff therefore has attached to this Amended Complaint exhibits filed with the Original Complaint (DOC 1), together with any other exhibits referenced herein, stating as needed, if these other exhibits have already been filed with the Court with prior motions, responses or replies. Plaintiff prays this satisfies the Court.)

## **PARTIES**

1.        Plaintiff Douglas E. Miller ("Miller") is an individual residing in Flathead County, Montana. Miller owns and is the transferee of a Bureau of Land Management ("BLM") grazing permit, certain grazing rights and preference rights associated with real property located in Yavapai County, Arizona.

2.        Defendant Department of Interior ("DOI") is a division of the United States government and is charged with administering lands within the regulatory jurisdiction of the BLM, including the Federal lands associated with the BLM grazing permit at issue in this action.

3.        Defendant Secretary of the Interior Sarah "Sally" Jewell is the federal officer responsible for proper administration of the BLM.

4.        Defendant BLM is a division of the Department of Interior and has authority over grazing permits issued by the BLM, and oversees the grazing rights and grazing preference at issue in this case.

5.          Defendant Director of the BLM Neil Kornze is a federal officer responsible for proper administration of the BLM.

6.          Defendant Starcrest is a California Corporation that owns or has owned property in Yavapai County, Arizona, and which has disputed the grazing rights and grazing preferences asserted by Miler in this action. Defendant Starcrest has caused acts to occur in Yavapai County which give rise to the claims alleged by Miller.

7.          Defendants Does I-XX and XYZ Corporations I-XX are individuals whose identities are presently unknown, but who may have acquired interests in property in Yavapai County from Defendant Starcrest, and may be participating in acts to preclude Miller's use of the grazing rights and grazing preference alleged in this lawsuit. These individuals and entities will be joined as parties upon discovery of their names or identities.

## JURISDICTION AND VENUE

8.          Multiple acts and issues complained of herein relate to court orders handed down by the United States Bankruptcy Court, District of Montana and this Court has jurisdiction under 28 U.S.C. § 1334.

9.          This action includes claims for declaratory relief. Jurisdiction is proper under the Declaratory Judgment Act, 28 U.S.C. § 2201. Federal question jurisdiction exists under 28 U.S.C. § 1331, and 28 U.S.C. § 1361 (mandamus actions). Miller has exhausted all administrative remedies available to him.

10.          This action includes claims for judicial review of unlawful agency action and this Court has jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701, 704.

11.     Jurisdiction for the Arizona common law tort claim is proper based upon diversity jurisdiction 28 U.S.C. § 1332, based upon diversity of citizenship and the amount in controversy exceeds $75,000.

12.     Venue is proper in the United States District Court pursuant to 28 U.S.C. § 1391 because certain defendants are agents of the United States government, a substantial part of the events or omissions giving rise to the claims herein having occurred in Arizona and a substantial part of the property, grazing rights and grazing preference that are the subject of this action are situated in Arizona. Venue is proper in this Division pursuant to LRCiv 77.1, as the Prescott Division includes Yavapai County.

## GENERAL BACKGROUND COMMON TO ALL CLAIMS

13.     The federally adjudicated JV Bar grazing preference was established sometime between 1934 and 1960. *(see Exhibit 1)*

14.     On or about June 8, 1980, Defendant Starcrest purchased ten (10) non-contiguous parcels of land in Yavapai County, Arizona, including Parcel No. 204-21-029, a 103-acre parcel known as the "Black Rock Parcel".

15.     Starcrest's purchase in or around 1980 also included the assignment or transfer to Starcrest of "Allotment No. 06222", a BLM grazing authorization which included an issued Grazing Permit and associated Grazing Preference to graze livestock on certain Federal leased lands in areas intermingled with the 10 non-contiguous parcels purchased by Starcrest.

16.      Allotment 06222 is also referred to at times in documents relevant to this action as "Allotment No. 06222", "BLM Lease 06222", or "J.V. Bar Grazing Allotment 06222".

17.      Starcrest's purchase in or around 1980 also included the assignment or transfer of Arizona State Lands Dpt.("State") Grazing Lease #05-1618. This lease grants the authority to graze livestock on State leased lands intermingling the 10 non-contiguous parcels purchased by Starcrest and is part of the aforementioned Grazing Preference.

18.      The "Black Rock Parcel" was at that time, and remains, the base property associated with BLM Lease #06222 and State Lease #05-1618

19.      Only the preference owner can hold the BLM and State leases and only the holder of the BLM and State leases can be the preference owner.

20.      On April 1, 1981, the BLM, through its Acting Area Manager, sent a letter to Starcrest explaining exactly how the 202 livestock carrying capacity allocated to the JV Bar grazing preference was distributed for grazing to the aforementioned BLM leased lands, State leased lands and private lands.

21.      The preference must be grazed in accordance with this distribution. (See EXHIBIT 2 attached (Exhibit A from Original Complaint)).

22.      Due to a land trade between the BLM and the AZ State Lands Dpt. that occurred sometime between 1981 and 1995, this livestock grazing capacity was subsequently increased to 209 head.

23.      On or around July 13, 1995 Starcrest sold and conveyed property titled the J.V Bar Ranch to non-party Richard L. Nelson ("Nelson").

5

24.         On or around Dec 23rd 1999 Miller bought the JV Bar Ranch from Nelson.

25.         In both of these real estate transactions the J.V. Bar Ranch property comprised the Black Rock Parcel (Parcel No. 204-21-029), together with BLM Lease #06222 and State Lease 05-1618 and their associated rights and grazing preference.

26.         In or around March 2008 Starcrest sued Miller in the Arizona Superior Court for Quiet Title and Declaratory Relief (*Starcrest v Miller*, Case # P1300-CV-2008-0464).

27.         Starcrest claimed the 1995 Starcrest to Miller sale was controlled by a Buy/Sell dated June 5th 1995 and that, as Starcrest had only transferred permissive use of its private parcels to Nelson, then only permissive use had transferred to Miller in 1999.

28.         The June 5th Buy/Sell says (*all emphases added*): "Seller will allow buyer use of and access to livestock  facilities and waters so long as title of the parcel remains in seller's name of Starcrest, Inc. and or family"(*see Ex 12, actual p6 of exhibit:Additional Requirement A*)

29.         Miller argued that all documents of record showed that the Starcrest to Nelson sale was controlled by an Exhibit B contract dated July 13th 1995 and that Starcrest had permanently transferred all of its interest in the 209 head grazing preference to Nelson, including: (i) the permanent use of, and access to, the 25 head AUM grazing acreage which is located on the private parcels and is part of the 209 head grazing preference; and (ii) the permanent use of, and access to, livestock

6

facilities and waters on the private parcels; and (iii) ownership of all Range Improvements, Co-operative Agreements and Water Rights associated with the grazing preference and appurtenant BLM and State leases.

30.     The Exhibit B contract states (all emphases added): "Seller will allow buyer use of and access to livestock facilities and waters so long as title of the parcel remains in seller's name of Starcres (sic), Inc. their heirs, successors and assigns." *(Ex 7, p2, ¶3).*

31.     Both contracts state (i) "This contract shall inure to the benefit of and is binding upon the parties and their beneficiaries, successors in interest and assigns." And (ii) "This contract, any attached exhibits and any addendums or supplements signed by the parties, shall constitute the entire agreement between seller and buyer and supersede any other written or oral agreements between seller and buyer. This contract can be modified only by a writing signed by seller and buyer"

32.     On November 4th 2010 the Arizona Superior Court's ruling upheld Starcrest's claims citing that the unrecorded June 5th Buy/Sell states *(see Ex 12, actual p4:Documents and Escrow C, emphasis added).* "If there is a conflict between the provisions of the contract and any escrow instructions executed pursuant hereto, the provisions of this contract shall be controlling"

33.     An almost identical paragraph appears in the July 13th Exhibit B Contract *(see Exhibit 7, p2:¶4, emphasis added)*: "If there is a conflict between the provisions of the real estate contract and any escrow instructions executed pursuant hereto, the provisions of the real estate contract shall be controlling"

34.         The Arizona Superior Court upheld Starcrest's claims and deemed the June 5th Buy/Sell to be the controlling contract.

35.         The Arizona Superior Court's ruling of November 4th 2010 ordered that, as regards Starcrest's real property, Miller only enjoyed permissive use of and access to livestock facilities and waters and "that permissive use may be revoked at any time by Starcrest, Inc., its heirs, successors or assigns". The court awarded Starcrest its reasonable attorney fees and costs.

36.         On August 9th 2011 Miller filed an appeal with the Arizona Court of Appeals ("COA") under Case #1-CA-CV-11-0395.

37.         On Jun 21st 2012 the COA issued its Memorandum Decision which "Affirmed As Modified" the Superior Court ruling. In ¶18 of its Decision the COA agreed with Miller's argument "that the word "will" generally denotes a mandatory intent" and, in ¶26 of its decision, modified the Superior Court ruling concluding that "the contract provides for a right to use Starcrest's private property until Starcrest sells the property to a buyer outside the family". The COA Decision upheld the Superior Court ruling in all other findings.

## FACTS REGARDING GRAZING PREFERENCES COMMON TO ALL CLAIMS

38.         The Taylor Grazing Act ("TGA") grants the Secretary of the Interior authority to issue leases or permits (a "Grazing Permit") to graze livestock on Federal lands and to charge reasonable fees for use of lands. 43 U.S.C. §§ 315, 315a 315b.

39.          The TGA specifies that there is an associated preference interest ("Preference Right") that is associated with a Grazing Permit in favor of the owner of such Preference Rights. 43 U.S.C. § 315b.

40.          The BLM generally refers to the Grazing Permit (issued by the BLM) and its associated Grazing Preference under the TGA as a 'grazing authorization". (*See EXHIBIT 6 attached (Exhibit H from Original Complaint) for an explanation of a BLM issued grazing authorization).*

41.          The TGA limits the Secretary's authorization to issue Grazing Permits to stock owners. 43 U.S.C. § 315b.

42.          The TGA does not create vested rights in land; however the TGA does create a right of value and an interest in favor of the licensee that may be enforced and protected. The Court of Appeals for the District of Columbia held:

*"[w]e rule that the valuable nature of the privilege to graze which arises in a licensee whose license will in the ordinary course of administration of the Taylor Grazing Act ripen into a permit, makes the privilege a proper subject of equitable protection against an illegal act." Red Canyon Sheep Co. v Ickes 98 F. 2d 308, 316(1938).*

43.          A federal grazing preference generally comprises some combination of (i) BLM land (and associated grazing lease), (ii) State land (and associated grazing lease), (iii) private lands owned by, and deeded to, the preference owner and (iv) other private lands which, although not actually owned by the preference owner, are under his control for grazing purposes, along with livestock facilities and water rights, range improvements and co-operative agreements.

44.        Preferences govern the grazing leases and stipulate how lands are allocated to the preference owner for purposes of grazing.

45.        No-one can hold this class of grazing lease without the associated and federally adjudicated grazing preference.

46.        (*Basset v Ryan* 72 Ariz. 383 (1951) 236 P.2d 458 (emphasis added)

> 3.        *It might be well to point out the distinction between a grazing preference and a grazing permit. This is well stated in N.F.-C4-3, Chapter C, Volume III, National Forest Protection and management, Forest Service Manual, as follows: "A preference conveys no legal right to the use of national forest range. It simply entitles the holder to special consideration over other applicants who have not established preferences. A preference does not entitle the holder to continue use of any certain part of the forest. The term 'preference' and 'permit' are not synonymous. A permit authorizes the grazing of livestock under specific conditions and expires *386 on a certain date, while preference continues until canceled or revoked."*

47.        Grazing permits/leases specify:

(i) <u>exactly</u> how Animal Unit Months ("AUMs") translate into a specified number of livestock that are permitted to graze any specific acreage. (*One AUM is defined as the amount of forage necessary to sustain <u>one</u> cow or equivalent for <u>one</u> month.*)

(ii) <u>exactly</u> how Animal Units ("AUs") are assigned acreage for grazing in reference to a grazing allotment. (*One AU equals the forage for one head of livestock grazed for one year.*)

48.        The lessee <u>must</u> graze his livestock according to these numbers and observe the assigned grazing acreage. *43 C.F.R 4110.2-3* and BLM regulations state that any changes require the agreement of the BLM and the <u>current lessee</u> and result in new terms and paperwork being issued <u>by the BLM</u> and subsequently filed as

10

permanent and legally binding records. BLM records show no change in the AUs assigned to the J V Bar grazing preference, including the AUs and AUMs assigned to Starcrest's private lands since 1989.

49.     The 209 AUs assigned to the JV Bar Ranch are currently as follows

| | | |
|---|---|---|
| BLM | 15,741.34 acres | 148 AUs |
| State | 3,064.77 acres | 36 AUs |
| Private | 1,887.67 acres | 25 AUs |

Of the 25 AUs assigned to Private lands, only about 1.25 is assigned to the Black Rock Parcel (ie. the Black Rock Parcel can graze 1 cow) with the rest of the AUs assigned to Starcrest's private parcels.

## FACTS REGARDING CHAIN OF TITLE COMMON TO ALL CLAIMS

50.     When a federal preference changes ownership, ownership and usage rights are assigned to the incoming owner by the federal agency (not by the outgoing owner).

*Bassett v. Ryan*, 72 Ariz. 387-388 (1951) 236 P.2d 458 states:

*"2. These permits and/or preferences cannot be transferred or assigned directly to the purchaser but can only be waived to the Forest Service, and within its sole discretion may be reissued."*

51.     The chain of title for a BLM grazing preference is therefore as follows: (i) outgoing preference owner to BLM and (ii) BLM to incoming preference owners.

11

52.        State transfers essentially follow the same process and only the AZ State Lands Dpt can issue the preference owner with the associated State lease.

## ALLEGATIONS REGARDING THE 1995 STARCREST TO NELSON SALE

53.        On August 28th/29th 1995 Starcrest and Nelson each applied to the BLM to transfer BLM Grazing Lease #06222 from Starcrest to Nelson. As required by federal law, they used BLM forms 4130-1a and 4130-1b respectively and signed their respective forms subject to the *Title 18 §1001. (see Ex 11, 4130-1a, page 2, below signature.*)

54.        The signing of BLM forms 4130-1a and 4130-1b instigated the chain of title procedure governing preference transfers wherein Starcrest relinquished its interest in the preference back to the BLM who then re-assigned it to Nelson.

55.        Starcrest's signed form 4130-1a, shows it relinquished <u>all</u> of its interest in the 209 head grazing preference to the BLM without any reservation of interest to be kept by Starcrest. (*see Ex 9, specifically the top of p2 of Form 4130-1a where Starcrest assigns "all" of its interest and handwrites "209"*)

56.        Had Starcrest wanted to retain any portion of lands assigned to the preference this had be done in accordance with the instructions on p1 of form 4130-1a which state "File a preference summary for the remaining parts". (*see Ex 9, p1 at bottom, Instructions, Preference Summary*)

57.          Starcrest never filed a preference summary for the remaining parts and their 4130-1a relinquished all interest in the 209 head without reservation or limitation.

58.          Starcrest subsequently filed with the BLM, or caused to have filed with the BLM, its signed BLM form 4130-1a and <u>attached the Exhibit B contract</u> as the supporting documentation.

59. Starcrest filed no other contract with its BLM form 4130-1a.

60.          On October 26th 1995 Starcrest relinquished all interest in the Arizona State Lands Dpt. Grazing Lease #05-1618 (as well as the preference that is associated with the State Grazing Lease) and the State Lands Dpt. subsequently issued full ownership rights to Nelson.

61.          As required by the terms of the State transfer application Starcrest and Nelson had to attach their written agreement to this application stating what was being transferred. They attached the HUD Statement along with p2 of the July 13th Exhibit B Contract with the wording as quoted in ¶ *30 above. (see Ex10, specifically actual pp 15 & 16 of the exhibit,* ¶3).


## <u>ALLEGATIONS REGARDING THE 1999 NELSON TO MILLER SALE</u>

62.          Miller comes from a ranching family and personally has over 50 years' experience owning and operating ranching businesses.

63.        Miller is very knowledgeable regarding any documentation that must be filed when a ranch and its appurtenant grazing preference and associated leases changes ownership

64.        Miller is very knowledgeable regarding the laws and regulations that govern the filings of these documents

65.        In 1999, prior to buying the JV Bar Ranch with its appurtenant grazing preference and associated BLM and State leases from Nelson, Miller exercised due diligence including researching County, BLM and AZ State Lands Dpt. records to verify the terms of the 1995 Starcrest to Nelson sale

66.        On file with Yavapai County Miller found: (i) the Starcrest to Nelson Warranty Deed dated July 13th 1995, recorded August 11th 1995 in Yavapai County. This warranted the Black Rock Parcel together with State of Arizona Grazing Lease #05-1618 and BLM Grazing Lease #06222 (see Ex 3 (Ex. B from Original Complaint)) and (ii) Nelson's Deed of Trust to Starcrest dated July 13th 1995, recorded August 11th 1995 in Yavapai County (Ex 8

67.        On researching BLM public records Miller found Starcrests's form 4130-1a signed Aug 25th 1995 and which Starcrest had filed in conjunction with the Exhibit B contract as the supporting documentation

68.        There was no other contract on file with Starcrest's 4130-1.

69.        There was no Preference Summary stating that Starcrest was retaining any of the 209 head AUs assigned to its private parcels.

14

70.     On researching the public records of the AZ State Lands Dpt. Miller found Starcrest's Lease Transfer Application filed with the HUD statement and p2 of the Exhibit B contract.

71.     All of Miller's research into the public records on file with the BLM and State, as well as with Yavapai County, showed him that he was purchasing the full 209 head grazing preference with all its appurtenant grazing preference and ownership rights as Nelson had indicated to him and in accordance with the Exhibit B contract.

72.     On or around Dec 23rd 1999 Miller bought the JV Bar Ranch from Nelson at full and fair market value paying Nelson $332,484.38 down (88.7% of the purchase price of $375,000) and issuing a promissory note for the balance

73.     A Warranty Deed dated Dec 23rd 1999 conveyed the 103-acre Black Rock Parcel as base property from Nelson to Miller. (see Exhibit 4 (Ex D from original Complaint)

74.     Nelson and Miller subsequently executed and filed the necessary forms with the BLM and the State to effect transfer of the relative grazing leases, together with their associated grazing preference and ownership rights.( see Exhibits 5 (Ex E from original Complaint)

75.     On July 18th 2000 Starcrest signed a Deed of Release stating Starcrest had been paid in full by Nelson for the Deed of Trust, dated July 13th 1995. This Deed of Release was then recorded with Yavapai County on Aug 14th 2000 (see Ex 11 attached, a true copy of Ex 5 filed with DOC 27)

76.        In his Deposition of February 26th, 2009 Nelson testified that the June 5th Buy/Sell was "the start of negotiations" and that he bought the ranch based on the wording of the July 13th Exhibit B contract which Starcrest filed with its 4130-1a

## ALLEGATIONS: STARCREST VIOLATED MILLER'S RIGHTS THROUGH NON-DISCLOSURE OF THE PERMISSIVE PROVISIONS OF THE JUNE 5th BUY/SELL

77.        *Title 18 U.S.C. §1001* makes it a crime for any person knowingly or willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction

78.        This reference to *Title 18 U.S.C. §1001* is clearly stated on both pages of form 4130-1a which Starcrest signed on Aug 29th 1995 stating it was transferring "all" of its interest in the 209 head Grazing Preference to Nelson. *(see Exhibit 9*

79.        In 2008 Starcrest sued Miller for Quiet Title and Declaratory Relief claiming the 1995 Starcrest to Nelson sale was controlled by the Buy/Sell dated June 5th 1995 and its permissive use provisions

80.        This proves that in 1995 Starcrest had full and complete knowledge that their sale to Nelson was subject to the permissive use provisions contained in the June 5th Buy/Sell prior to filing their 4130-1a with the BLM on Aug 29th 1995 and prior to filing their State Lease Transfer Application with the AZ State Lands Dpt. on Oct 26th 1995

16

81.          Starcrest made both of these filings in conjunction with the Exhibit B contract and not the June 5th Buy/Sell

82.          Starcrest had a duty to file true and accurate information with the BLM and the AZ State Lands Dpt. but the documents it actually filed failed to disclose any permissive use provision of their private lands

83.          When doing his due diligence in 1999, and based on the documents Starcrest knowingly and actually filed, or caused to have filed, with both the BLM and the AZ State Lands Dpt. Miller was led to believe that the Exhibit B contract controlled the 1995 Starcrest to Nelson sale and that Nelson was legally able to transfer those rights to Miller.

84.          Accordingly, Miller had every right to believe that whenever Starcrest chose to sell any or all of its nine (9) remaining private parcels (the tenth being the base property Black Rock Parcel now owned by Nelson), it would do so subject to the provisions of the Exhibit B contract and that any and all of Starcrest's "heirs, successors and assigns" regarding their private parcels would also allow the JV Bar preference owner "use of and access to livestock facilities and waters" on those private parcels, thereby preserving his 209 head grazing preference and associated right

85.          As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, Miller was denied the opportunity to effect full and proper due diligence prior to purchasing the JV Bar Ranch in 1999.

86.          Had Starcrest fulfilled its duty to file true and accurate information with the BLM and AZ State Lands Dpt. Miller would have discovered the existence of

17

the June 5th Buy/Sell and its permissive use provisions when doing his due diligence and would not have purchased the ranch from Nelson.

87.        Subsequent to Miller's purchase of the ranch in 1999, and prior to Starcrest's 2008 lawsuit, Miller filed a defensive bankruptcy in March 2001 (Montana Bankruptcy #01-30752-11).

88.        Had Miller known of the permissive provisions of the June 5th Buy/Sell, Miller would have listed Starcrest as a contested creditor.

## ALLEGATIONS: STARCREST VIOLATED MILLER'S RIGHTS THROUGH FAILURE TO PERFORM UNDER 43 U.S.C.§ 315c, A.R.S.33-707 and A.R.S 45-151 in connection with AZ STATE LAND DPT.LEASE ARTICLES

89.        When Starcrest purchased the ranch, the purchase included multiple improvements assigned to the BLM and State Grazing Leases.

90.        These improvements were transferred to Starcrest as an intrinsic and inseparable part of the J V Bar grazing preference when it purchased from prior owners St Claire.

91.        Starcrest has argued that these transfers were not part of the Starcrest/Nelson sale, yet the Warranty Deed which they signed on July 13th 1995 warranted not just the 103 deeded acres but also the BLM and State grazing leases and all that they encompass.

92.        Whoever owns the BLM and State Grazing Leases owns these rights and all subsequent improvements made on BLM and State Land.

93.        These Range Improvements, Water Rights and Cooperative Agreements are real property for which Starcrest has been paid in full but has never

transferred. Full and final payment was acknowledged when Starcrest recorded the Release of the Deed of Trust, July 18th 2000. Some water rights were transferred to Nelson but Starcrest kept most in violation of the BLM and State Grazing Lease transfers that Starcrest signed. *(A list of Starcrest non-performance issues and their legal description is given in Exhibit 13.)*

94.    There is no time bar issue pertaining to Miller's Claim for Specific Performance as regards the BLM and State Grazing Leases which fall under the jurisdiction of those agencies.

95.    The Range Improvements, Water Rights and Cooperative Agreements on BLM and State land became the legal property of Nelson when he took ownership of the BLM and State Grazing Leases in 1995, and the legal property of Miller when he took ownership of the Leases in 1999.

### ALLEGATIONS: STARCREST VIOLATED MILLER'S RIGHTS THROUGH BREACH OF MULTIPLE CONTRACTS

96.    By and though its 4130-1a of Aug 29th 1995, Starcrest relinquished all interest in its 209 head preference, including all preference rights associated with its private lands and the BLM and State leased lands.

97.    Page 1 (#2) and page 8a (#3) of the Starcrest's State Transfer Application certifies that Nelson paid Starcrest $198,000 for the sale, plus "**transfer and assumption of all rights, title, interest….**" and that 1822.52 of "**contiguous**

**private land"** would "be used in conjunction with the State lease lands" (emphasis added)*(Ex 10: p1 & p8a).*

98.    By signing the BLM and State Transfer applications respectively subject to Title 18 and to perjury, Starcrest **certified** to Nelson, **without any limitations**:

(i)    access for maintenance to all Improvements on BLM, State and private land

(ii)    the use of their private land in conjunction with the transfer of the State Grazing Lease.

99.    These guarantees must be read in conjunction with the following 2 paragraphs which appear in **both** the June 5th Buy/Sell **and** the Exhibit B contract *(Exhibit 12, p3 of Buy/Sell)*:

(i)    "Seller agrees to execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered additional documents and instruments, including without limitation, any deeds, assignments, grants or conveyance of water rights, use rights, vested rights, licenses, easements or rights of way necessary for buyer to acquire the rights to use any water rights and any wells which serve or are located on the property (subject to the interests of persons other than the seller, which interest shall be disclosed to buyer) **as well as all easements, licenses, or rights of way which may be necessary or convenient for the use of such water rights or wells.** Neither any broker nor the seller is making any representation or warranty, expressed or implied concerning right to adequacy of or quality of any water supply or water rights with respect to the property" (emphasis added)

and: *(Exhibit 12, p2 of Buy/Sell, ¶8):*

(ii)   "This contract shall inure to the benefit of and is binding upon the parties **and their beneficiaries, successors in interest and assigns**." (emphasis added).

100.        Starcrest has failed to deliver on these issues which for many years has hampered Miller's ranching operations.

101.        43 C.F.R. §4110.2-3(a)(2) states that the interest in Range Improvements and Co-operative Agreements is required to be transferred at the same time as the grazing preference.

## **ALLEGATIONS: STARCREST'S ACTIONS HAVE DAMAGED MILLER**

102.        In 1999, aged 51 years and with over 30 years of experience owning and operating ranching businesses, Miller bought the JV Bar Ranch from Nelson for $375,000 as a business investment with the intent of (i) creating Operational Income; (ii) working to increase its value; and (3) selling it at a profit and reinvesting the proceeds to fund his retirement.

103.        In 2005, after working to improve the ranch for 6 years, Miller listed the ranch for sale at a fair market value of $650,000.

104.        Although there were many interested buyers, none were able to obtain the financing they needed due to the economic climate of the time.

105.        Miller did not want to finance the sale as he wished to cash out in order to re-invest and create passive income for his retirement.

106.        In 2007 Miller relisted the ranch for sale at a fair market value of $850,000.

107.        Between 1999 and 2007 Miller invested approximately a further $250,000 in the ranch as well as untold hours of sweat equity.

108.     During this time, Miller made considerable improvements to water and livestock facilities, both on BLM and State leased lands as well as on Starcrest's private parcels in the belief that, as the lessee and the owner of the preference, he had permanent access and usage rights to these facilities.

109.     This belief, and Miller's resulting business decision to invest money, time and effort in the JV Bar Ranch, was based on the documents Starcrest filed with the BLM and State in 1995, specifically: (i) the 4130-1a filed in conjunction with the Exhibit B contract and (ii) the State Lease Transfer Application filed in conjunction with p2 of the Exhibit B contract.

110.     When Starcrest filed its 2008 lawsuit against Miller the ranch became unsellable.

111.     When Starcrest prevailed in its Superior Court action Miller lost permanent control of the grazing preference rights assigned to Starcrest's private lands.

112.     The value of the JV Bar ranch comes predominantly from its BLM grazing preference encompassing the BLM and State grazing leases as well as the private lands assigned to the grazing preference

113.     An AU on private land is considered more valuable than an AU on leased land

114.     Currently in Arizona one (1) AU on private land is worth about $5000 on the open market and the loss of control of the 24 AUs assigned to Starcrest's private lands means the ranch's value is reduced by about $120,000.

22

115.     The issue of loss of control of access and easements through the private parcels has totally devastated the ranch's value.

116.     The Black Rock Parcel (the base property for the preference) was one of the ten (10) non-contiguous private parcels purchased by Starcrest in or around 1980.

117.     Although Miller is now the legal owner of this base property it affords him no way to access the BLM or State leased lands.

118.     Due to the mountainous Arizona desert terrain of the JV Bar Ranch, the remaining nine (9) private parcels land lock about 90% of the BLM and State leases lands in question leaving Miller permanent access to only 10% of his ranching business.

119.     This fact alone has devastated his income and makes the ranch unsellable leaving Miller virtually penniless and his retirement plans in ruins.

120.     Additionally, as the lessee and legal owner of the preference, Miller has legal contractual obligations with BLM and State to maintain livestock facilities on the leased lands as well as waters for wildlife.

121.     Miller cannot fulfil these without a viable easement to his leased lands.

122.     These financial losses together with the ongoing emotional stress of all these issues have also severely exacerbated Miller's health, particularly in regards to his heart disease and he has recently had surgery to place a defibrillator inside his heart to prevent it from stopping.

123.        Had Miller known of the June 5th Buy/Sell and its permissive provisions, he would never have bought the ranch from Nelson and would not be in this position.

**ALLEGATIONS: THE FEDERAL DEFENDANTS HAVE VIOLATED MILLER'S RIGHTS THROUGH (i) FAILURE TO DISCLOSE; (ii) NEGLIGENCE; AND (iii) FAILURE TO MAINTAIN ACCURATE RECORDS FROM WHICH MILLER HAS SUFFERED DAMAGE.**

124.        (i) BLM Handbook 1270 states that the BLM is required to maintain accurate records.

125.        Prior to deciding to buy the JV Bar Ranch from Nelson in 1999, Miller, a lifelong rancher with many years of experience operating and improving ranching businesses, researched BLM records as part of his due diligence to verify the terms of the 1995 Starcrest to Nelson sale.

126.        The BLM provided Miller with Starcrest's 4130-1a in conjunction with the Exhibit B contract as the supporting documentation.

127.        The BLM failed to disclose to Miller any records of the permissive provisions of the June 5th Buy/Sell or Starcrest's retained portion of the JV Bar 209 head grazing preference.

128.        (ii) In 1995, and in violation of C.F.R. §4100 and 43 U.S.C. §§ 315(b) and 315(c), the BLM were negligent by failing to verify that Starcrest had failed to execute the correct paperwork necessary to relinquish title to certain Access Rights, Range Improvements, Co-operative Agreements and Water Rights appurtenant to the 209 preference before assigning the grazing preference to Nelson.

129.        As a result they failed to transfer title to Miller in 19999.

130.        This only became apparent when Starcrest filed its 2008 lawsuit against Miller.

131.        The BLM had a duty to execute these transfers, which it breached.

132.        But for the negligent actions of the BLM, Miller would now have clear title to these improvements.

133.        As the designated federal agency that administers and oversees these transfer,the BLM could and should have foreseen the problems and injury that Miller has suffered as a result of their negligence.

134.        (iii) From a period of time commencing Aug 29th 1995 and continuing through to at least 2008, and in violation of 28.U.S.C, Appendix in conjunction with BLM Handbook 1270, the BLM failed to maintain accurate records, specifically any records relating to the permissive use provision of the June 5th Buy/Sell that controlled the 1995 Starcrest to Nelson sale as deemed by the Arizona Courts.

135.        Miller's decision to purchase the JV Bar Ranch was based to a large extent on BLM records and his trust that they could and would perform their duties efficiently.

136.        The time money and effort Miller put into the ranch has already been stated and Miller hereby restates and realleges ¶103-108 as if fully set forth herein.

137.        The harm Miller has suffered as a result of (i) the BLM's failure to disclose; (ii) the BLM's negligence; and (iii) the BLM's failure to maintain accurate

records has already been stated and Miller hereby restates and realleges ¶110-123 as if fully set forth herein.

## COUNT 1 (AGAINST DEFENDANT STARCREST):
### VIOLATION OF MILLER'S RIGHTS AND FAILURE TO DISCLOSE UNDER TITLE 18 U.S.C. §1001

138.      MILLER reasserts and realleges each and every allegation against Starcrest in this complaint as if fully set forth herein.

139.      Starcrest violated Miller's federal rights when, on Aug 29th 1995, in conjunction with its BLM form 4130-1a, and in violation of *Title 18 U.S.C. §1001*, it knowingly filed false, inaccurate and misleading information with the BLM which did not disclose the actual "permissive use" provisions of the Starcrest to Nelson sale as deemed by the Arizona Courts.

140.      On Aug 29th 1995 Starcrest signed its BLM form 4130-1a subject to *Title 18 U.S.C. §1001*.

141.      Starcrest filed with the BLM, or caused to have filed with the BLM, its 4130-1a in conjunction with the Exhibit B contract with no mention of retaining any part of the 209 head grazing preference or the permissive use provision of the June 5th Buy/Sell.

142.      It is an undisputed fact that Starcrest never filed the June 5th Buy/Sell anywhere.

143.    Starcrest's 2008 lawsuit against Miller claimed the 1995 June 5th Buy/Sell to be the controlling contract for the 1995 Starcrest to Nelson sale and the subsequent 1999 Nelson to Miller sale.

144.    By making this claim Starcrest showed it had full and complete knowledge that their sale to Nelson was subject to the permissive use provisions of the June 5th Buy/Sell prior to filing their 4130-1a and Exhibit B contract with the BLM on Aug 29th 1995.

145.    As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, Miller was denied the opportunity to effect full and proper due diligence prior to purchasing the JV Bar Ranch in 1999.

146.    As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, the resell value of Miller's ranching business has been ruined and the ranch is now unsellable.

147.    As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, Miller's finances and retirement plans have been devastated and he is virtually penniless.

148.    As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell its permissive use provisions, Miller has suffered severe emotional distress which has exacerbated his health, particularly in relation to his heart condition.

149.    Had Starcrest filed the June 5th Buy/Sell with its 4130-1a, Miller would have learned of the permissive provisions it contained and would not have purchased the ranch.

150.       Miller is entitled to damages for these injuries, losses and business interference in an amount to be determined by this Court or proven at trial.

**COUNT 2 (AGAINST DEFENDANT STARCREST):**
**VIOLATION OF MILLER'S RIGHTS AND FAILURE TO DISCLOSE UNDER**
**UNDER A.A.R. R4-28-A1216 in conjunction with RESTATEMENT (SECOND) of**
**CONTRACTS § 161 (1981) (RESTATEMENT); see RESTATEMENT (SECOND) of**
**TORTS §551 (1977)**

151.       MILLER reasserts and realleges each and every allegation against Starcrest in this complaint as if fully set forth herein,

152.       Starcrest violated Miller's federal rights when, on Oct 26th 1995, in conjunction with its AZ State Lands Dpt. Lease Transfer Application, and in violation of *A.A.R.R4-28-A1216 in conjunction with Restatement (second) of Contracts §161 (1981) (Restatement); see Restatement (second) of Torts §551 (1977),* it knowingly filed false, inaccurate and misleading information with the AZ State Lands Dpt. which did not disclose the actual "permissive use" provisions of the Starcrest to Nelson sale as deemed by the Arizona Courts.

153.       On Oct 26th 1995 Starcrest signed its State Lease Transfer Application subject to perjury.

154.       Starcrest filed with the AZ State Lands Dpt, or caused to have filed with the AZ State Lands Dpt, its State Lease Transfer Application in conjunction with p2 of the Exhibit B contract with no mention of retaining any part of the 209 head grazing preference or the permissive use provision of the June 5th Buy/Sell.

155.       It is an undisputed fact that Starcrest never filed the June 5th Buy/Sell anywhere.

156.        Starcrest's 2008 lawsuit against Miller claimed the 1995 June 5th Buy/Sell to be the controlling contract for the 1995 Starcrest to Nelson sale and the subsequent 1999 Nelson to Miller sale.

157.        By making this claim Starcrest showed it had full and complete knowledge that their sale to Nelson was subject to the permissive use provisions of the June 5th Buy/Sell <u>prior</u> to filing their State Lease Transfer Application and Exhibit B contract with the AZ State Lands Dpt. on Oct 26th 1995.

158.        As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, Miller was denied the opportunity to effect full and proper due diligence prior to purchasing the JV Bar Ranch in 1999.

159.        As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, the resell value of Miller's ranching business has been ruined and the ranch is now unsellable.

160.        As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, Miller's finances and retirement plans have been devastated and he is virtually penniless.

161.        As a direct consequence of Starcrest's non-disclosure of the June 5th Buy/Sell and its permissive use provisions, Miller has suffered severe emotional distress which has exacerbated his health, particularly in relation to his heart condition.

162.        Had Starcrest filed the June 5th Buy/Sell with its State Transfer Lease Applicaiont, Miller would have learned of the permissive provisions it contained and would not have purchased the ranch.

163.　　　　Miller is entitled to damages for these injuries, losses and business interference in an amount to be determined by this Court or proven at trial.

## COUNT 3 (AGAINST DEFENDANT STARCREST):
### VIOLATION OF MILLER'S RIGHTS UNDER 43 U.S.C.§ 315c, A.R.S.33-707 and A.R.S 45-151 in connection with AZ STATE LAND DPT.LEASE ARTICLES

164.　　　　MILLER reasserts and realleges each and every allegation against Starcrest in this complaint as if fully set forth herein.

165.　　　　In violation of *43 U.S.C. §315c, A.R.S.33-707* and *A.R.S.45-151 in connection with the AZ State Land Dpt . State Grazing Lease Articles 10.1, 10.6 and 18.1,* Starcrest has violated Miller's rights by failing and/or refusing to execute the necessary paperwork that transfers title to the Range Improvements, Cooperative Agreements and Water Rights that belong to the JV Bar grazing preference and appurtenant BLM and State leased lands.

166.　　　　These are Range Improvements, Cooperative Agreements and Water Rights for which Starcrest has been paid in full as evidenced by their Deed of Release signed July 18th 2000 subject to *A.R.S. 33-707.*

167.　　　　Only the owner of the preference and appurtenant grazing leases can legally own these the Range Improvements, Cooperative Agreements and Water Rights.

168.　　　　Miller is the undisputed sole owner of the JV Bar preference and the lessee in Good Standing with both the BLM and the AZ State Lands Dpt.

169.　　　　As such, Miller is entitled to (i) specific performance on these issues and (ii) damages in an amount to be determined by this Court or proven at trial.

## COUNT 4 (AGAINST DEFENDANT STARCREST):
## VIOLATION OF MILLER'S RIGHTS THROUGH BREACH OF CONTRACT

170.     MILLER reasserts and realleges each and every allegation against Starcrest in this complaint as if fully set forth herein.

171.     In areas of Specific Performance, Starcrest has failed to live up to the terms of the June 5th 1995 real estate contract which, in accordance with the rulings of the Arizona State Courts in *Starcrest v Miller*, Case # P1300-CV-2008-0464, controlled the terms of the Starcrest to Nelson 1995 sale and subsequently the Nelson to Miller 1999 sale.

172.     The June 5th Buy/Sell contract clearly agrees to deliver on areas of specific performance (See ¶ 99)

173.     Starcrest has failed to deliver on many of these issues particularly regarding the issues of transfer of Water Rights and the issues of easements.

174.     For many years this has hampered Miller in his ranching operations

175.     In line with the rulings of the Arizona State Courts in *Starcrest v Miller*, Case # P1300-CV-2008-0464, Miller is entitled to (i) specific performance and (ii) damages in an amount to be determined by this Court or proven at trial


## COUNT 5 (AGAINST FEDERAL DEFENDANTS):
## VIOLATION OF MILLER'S RIGHTS THROUGH FAILURE TO DISCLOSE
## UNDER BLM HANDBOOK 1270 and BLM HANDBOOK H-1270-1

176.     MILLER reasserts and realleges each and every allegation against the Federal Defendants in this complaint as if fully set forth herein.

177.　　　　The Federal Defendants, by and through its officers at the BLM, violated Miller's rights when, in a period of time commencing Aug 1995 and continuing through and beyond March 2008, and in violation of *BLM Handbooks 1270 andH-1270-1,* it failed to disclose to Miller, or any other interested party, any record relating to the permissive use provision of the June 5th Buy/Sell that controlled the 1995 Starcrest to Nelson sale as deemed by the Arizona Courts.

178.　　　　The Federal Defendants, by and through its officers at the BLM, violated Miller's rights when, in a period of time commencing Aug 1995 and continuing through and beyond March 2008,  and in violation of *BLM Handbooks 1270 andH-1270-1,* it failed to disclose to Miller, or any other interested party, any record that in 1995 Starcrest had retained the portion of the JV Bar 209 head grazing preference that is allocated to the private parcels other than the Black Rock parcel as deemed by the Arizona Courts.

179.　　　　As a direct consequence of the BLM's non-disclosure of the permissive use provisions of the June 5th Buy/Sell and of the BLM's non-disclosure of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller was denied the opportunity to effect full and proper due diligence prior to purchasing the JV Bar Ranch in 1999.

180.　　　　As a direct consequence of the BLM's non-disclosure of the permissive use provisions of the June 5th Buy/Sell and of the BLM's non-disclosure of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller's ranching business has been ruined and the ranch is now unsellable.

181.      As a direct consequence of the BLM's non-disclosure of the permissive use provisions of the June 5th Buy/Sell and of the BLM's non-disclosure of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller's finances and retirement plans have been devastated.

182.      As a direct consequence of the BLM's non-disclosure of the permissive use provisions of the June 5th Buy/Sell and of the BLM's non-disclosure of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller has suffered severe emotional distress which has exacerbated his health, particularly in relation to his heart condition.

183.      Sovereign Immunity is waived under the Federal Tort Claims Act

184.      Miller is entitled to damages for these injuries and business interference in an amount to be determined by the Court or proven at trial.

## COUNT 6 (AGAINST FEDERAL DEFENDANTS):
## VIOLATION OF MILLER'S RIGHTS THROUGH NEGLIGENCE UNDER 43 C.F.R §4100 and 43 U.S.C.§§ 315(b) and 315(c)

185.      MILLER reasserts and realleges each and every allegation against the Federal Defendants in this complaint as if fully set forth herein.

186.      The Federal Defendants, by and through its officers at the BLM, violated Miller's rights when in 1995, and in violation of C.F.R. §4100 and 43 U.S.C. §§ 315(b) and 315(c), they were negligent by failing to verify that Starcrest had failed to execute the correct paperwork necessary to relinquish title to certain Access Rights, Range Improvements, Co-operative Agreements and Water Rights appurtenant to the

209 before assigning the grazing preference to Nelson which only became apparent when Starcrest filed its 2008 lawsuit against Miller.

187.     In compliance with 43 U.S.C.§315(c), Nelson effected full payment to Starcrest for Access Rights, Range Improvements, Co-operative Agreements and Water Rights through his Deed of Trust dated July 13th 1995 and Starcrest's Deed of Release dated July 18th 2000.

188.     In compliance with 43 U.S.C.§315(c), Miller effected full payment to Starcrest for these Range Improvements, Co-operative Agreements and Water Rights through his 1999 down payment and promissory note which was fulfilled April 10th 2002.

189.     The Federal Defendants, by and through its officers at the BLM, owed a duty to Miller to fully execute these transfers.

190.     The Federal Defendants, by and through its officers at the BLM, breached this duty by failing to exercise reasonable care.

191.     But for the negligent actions of the Federal Defendants, by and through its officers of the BLM, Miller would now have clear title to these Range Improvements, Co-operative Agreements and Water Rights as is his legal right as the preference owner and lessee in Good Standing.

192.     As the designated federal agency that administers and oversees the transfers of Range Improvements, Co-operative Agreements and Water Rights appurtenant to a grazing preference, the Federal Defendants, by and through its officers at the BLM, could and should have foreseen the problems and injury that Miller has suffered as a result of their negligence.

34

193.     Sovereign Immunity is waived under the Federal Tort Claims Act.

194.     Miller is entitled to relief on this issue as well as damages for this injury and business interference.

### COUNT 7 (AGAINST FEDERAL DEFENDANTS): VIOLATION OF MILLER'S RIGHTS THROUGH FAILURE TO MAINTAIN ACCURATE RECORDS UNDER 28 U.S.C., APPENDIX in conjunction with BLM HANDBOOK 1270

195.     MILLER reasserts and realleges each and every allegation against the Federal Defendants in this complaint as if fully set forth herein.

196.     The Federal Defendants, by and through its officers at the BLM, violated Miller's rights when, from a period of time commencing Aug 29th 1995 and continuing through to at least 2008, and in violation of 28.U.S.C, Appendix in conjunction with BLM Handbook 1270, it failed to maintain accurate records, specifically any records relating to the permissive use provision of the June 5th Buy/Sell that controlled the 1995 Starcrest to Nelson sale as deemed by the Arizona Courts.

197.     The Federal Defendants, by and through its officers at the BLM, violated Miller's rights when, from a period of time commencing Aug 29th 1995 and continuing through to at least 2008, and in violation of 28.U.S.C, Appendix in conjunction with BLM Handbook 1270, it failed to maintain accurate records, specifically any records relating to Starcrest's retained portion of JV Bar 209 head grazing preference as deemed by the Arizona Courts.

198. BLM Handbook 1270 requires the Federal Defendants, by and through its officers at the BLM to maintain accurate records to the standards of the Federal Rules of Evidence 28 U.S.C., Appendix.

199.        As a direct consequence of the BLM's failure to maintain any records pertaining to the permissive use provisions of the June 5th Buy/Sell, and/or of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller was denied the opportunity to effect full and proper due diligence prior to purchasing the JV Bar Ranch in 1999.

200.        As a direct consequence of the BLM's failure to maintain any records pertaining to the permissive use provisions of the June 5th Buy/Sell, and/or of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller's ranching business has now been ruined and the ranch is now unsellable.

201.        As a direct consequence of the BLM's failure to maintain any records pertaining to the permissive use provisions of the June 5th Buy/Sell, and/or of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller's finances and retirement plans have been devastated.

202.        As a direct consequence of the BLM's failure to maintain any accurate records pertaining to the permissive use provisions of the June 5th Buy/Sell and/or Starcrest's retained portion of JV Bar 209 head grazing preference, Miller has suffered severe emotional distress which has exacerbated his health, particularly in relation to his heart condition.

203.        As a direct consequence of the BLM's failure to maintain any

accurate records pertaining to the permissive use provisions of the June 5th Buy/Sell

and/or of Starcrest's retained portion of JV Bar 209 head grazing preference, Miller

was denied the knowledge and opportunity to name Starcrest as a creditor in his 2001

Bankruptcy (Montana Bankruptcy #01-30752-11) as person or persons having a claim

on his federally adjudicated grazing preference.

204.        Sovereign Immunity is waived under the Federal Tort Claims Act.

205. Miller is entitled to damages for these injuries and business interference in

an amount to be proven at trial.

## DEMANDS

WHEREFORE, Miller prays that the Court grant judgment in favor of Douglas

Miller as follows:

A.        An award of damages for all counts against Defendant Starcrest in

an amount to be determined by the Court or proven at trial.

B.        An award of compensatory damages for all counts against

Defendant Starcrest in an amount to be determined by the Court or proven at trial.

C.        An award of punitive damages for all counts against Defendant

Starcrest in an amount to be determined by the Court or proven at trial.

D.        Re Count 1: A determination from this Court as to whether the U.S

Dpt. of Justice should prosecute Starcrest for knowingly causing false, inaccurate and

misleading information to become part of BLM public records in violation of Title 18

U.S.C. §1001.

E.          Re Counts 1 & 2: A determination from this Court as to whether Starcrest committed fraud and should be prosecuted.

F.          Re Count 2: A determination from this Court as to whether Starcrest committed perjury in its 1995 State Lease Transfer Application and should be prosecuted.

G.          Re Count 3: That Defendant Starcrest effect full and proper transfer to Miller of title to the Range Improvements, Cooperative Agreements and Water Rights appurtenant to the preference and its associated leases and for which they have been paid in full.

H.          Re Count 3: That, if Defendant Starcrest is found to have transferred title of any of these Range Improvements, Cooperative Agreements and Water Rights appurtenant to the preference and its associated leases to any of the Unnamed Defendants who have since purchased any of Starcrest's private parcels, Starcrest be ordered to rectify this matter in favor of Miller.

I.          Re Count 4: That, pursuant to the June 5th Buy/Sell contract which the AZ State Courts have deemed controlled both the 1995 Starcrest to Nelson sale and the subsequent 1999 Nelson to Miller sale, Defendant Starcrest transfer all relevant Water Rights to Miller.

J.          Re Count 4: That, pursuant to the June 5th Buy/Sell contract which the AZ State Courts have deemed controlled both the 1995 Starcrest to Nelson sale and the subsequent 1999 Nelson Miller sale, Defendant Starcrest grant Miller reasonable easements to his BLM and State leased lands so that he may fulfill his legal obligations as preference owner and lessee.

K.        Re Count 4: That, if Defendant Starcrest is found to have sold any of its private parcels to any Unnamed Defendants without informing them of the Water Right and easement provisions of the June 5th Buy/Sell contract, that Defendant Starcrest be ordered to rectify these matters in favor of Miller.

L.        An award of damages for all counts against the Federal Defendants in an amount to be determined by the Court or proven at trial.

M.        An award of compensatory damages for all counts against the Federal Defendants in an amount to be determined by the Court or proven at trial

N.        An award of punitive damages for all counts against the Federal Defendants in an amount to be determined by the Court or proven at trial.

O.        Order the Federal Defendants to cause Starcrest to effect and complete actual <u>deeded</u> transfer to Miller of all the Range Improvements, Co-operative Agreements and Water Rights pertaining to the 209 head federal grazing preference.

P.        Award Miller attorneys' fees and costs incurred in this action. 28 U.S.C. § 2200 and A.R.S. § 12-341.01.

Q.        Grant such further relief, remedies or judgements as this Court deems just and proper, and which do not conflict with the rulings of the AZ State Courts in *Starcrest v Miller,* P1300-CV-2008-0464, which grant Miller reasonable access to his BLM and State leased lands and allow him to fulfill his legal obligations as preference owner and lessee.

R.        Any other relief, remedies or judgments deemed just and equitable by this Court.

//

39

1    DATED this 28th day of April, 2016

2

3

4

5                                             Douglas E. Miller
                                              Plaintiff pro se
6

7                    **CERTIFICATE OF SERVICE**

8
     Original and ONE copy of the foregoing
9    mailed via Fed Ex this 28th day of April, 2016 to:

10   Clerk, United States District Court
     District of Arizona
11   Sandra Day O'Connor U.S. Courthouse
     401 West Washington St., Suite 130, SPC 1
12   Phoenix, AZ 85003-2118

13
     ONE copy of the foregoing mailed
14   this 28th day of April, 2016 to:

15   John S. Leonardo (United States Attorney, District of Arizona)
     & Adam R. Smart (Assistant United States Attorney, District of Arizona)
16   Two Renaissance Square
     40 North Central Avenue, Suite 1200,
17   Phoenix, AZ  85004-4408

18
     ONE copy of the foregoing mailed
19   this 28th day of April, 2016 to:

20   Douglas J Suits
     Suits Law Firm
21   P. O. Box 2642
     Prescott, AZ 86302

22

23

24
     By
25      Douglas E. Miller

26

27

28

                                    40